# In the United States Court of Federal Claims

No. 23-1635C
(Filed Under Seal: October 30, 2023)
(Reissued on: November 15, 2023)[1]

*******************************************
                                           *

A. PRENTICE RAY AND ASSOCIATES, LLC,  *
                                           *
               Plaintiff,          *
                                           *
     v.                       *
                                           *
THE UNITED STATES,          *
                                           *
               Defendant.        *
                                           *
*******************************************

## OPINION AND ORDER

On September 22, 2023, Plaintiff, A. Prentice Ray and Associates, LLC ("APRA") filed a post-award bid protest.[2] On October 10, 2023, Plaintiff filed a Motion for Preliminary Injunction ("Motion"). In its Motion, APRA seeks to enjoin the Department of State ("the agency") from awarding task orders or otherwise allowing performance under the indefinite quantity, indefinite delivery ("IDIQ") contracts awarded to Maven-OFS JV ("Maven") and DGI-ATI JV, LLC ("DGI") pursuant to RFP No. 9AQMM22R0221.[3] The value of the contracts is $100 million. APRA currently provides one half of the RFP's statement of work.

---

[1] This Opinion and Order was filed under seal in accordance with the Protective Order. The parties were given an opportunity to identify protected information for redaction. The parties filed a joint status report identifying protected information for redaction which the Court accepted.

[2] This case was assigned to the undersigned as APRA filed a Notice of Directly Related Case together with its complaint. Previously, this Court was assigned case No. 23-182C, *A. Prentice Ray & Assoc. v. United States*, challenging the agency's decision to override the automatic stay triggered by APRA's filing of its protest at the GAO. The agency's decision to stay performance, however, was reinstated and the case was dismissed as moot.

[3] HTGS-Culmen JV, LLC was also awarded the IDIQ contract, but APRA does not seek to enjoin them from performance.

In support of its Motion, APRA contends that the agency's price realism evaluation was flawed, and thus, the flawed evaluation undermined the agency's final decision that Maven and DGI offered the agency a "better value" than APRA. Instead, APRA argues both Maven and DGI should have been eliminated from consideration for award due to their unrealistic pricing.

Defendant, the United States, ("the Government") filed its response in opposition on October 11, 2023, and APRA filed its reply on October 13, 2023.

On October 23, 2023, ARPA filed a Motion to Supplement the Record. On October 25, 2023, Defendant responded in opposition.

The Court held a hearing and argument on October 26, 2023. At the hearing, the Contracting Officer ("CO"), testified as to certain actions she took in reviewing the proposed bids. Also, at the hearing, the Court granted Plaintiff's Motion to Supplement the Record. In granting the Motion, the Court first reviewed with the CO her Declaration which was attached to the Government's response. ECF No. 35-1. After review and argument by the parties, the Court was persuaded that the additional information was necessary because APRA created a factual dispute by claiming that "[t]he Agency…took at face value the Maven JV's representation in its proposal that it was able to hire 90% of the 'incumbents' at the unburdened labor rates included in its proposal. However, the Agency knew that that statement was false."[4] ECF No. 34 at 15-16.

For the reasons set forth below the Court **DENIES** APRA's Motion for Preliminary Injunction.

I. BACKGROUND

A. The Solicitation

On July 25, 2022, the agency issued RFP No. 19AQMM22R0221, a small business set aside, to assist the Bureau of Administration Office of Operations ("A/OPR") for technical, administrative, and professional staffing support. The functions included real property management, facilities management, industry design, construction, commissioning, space management, administration, logistics, budget and finance, information technology, and project management. AR 325-27; 373.[5] Each IDIQ contract will have a 5-year term comprised of a 1-year base and four 1-year options. The RFP contemplated a best value trade-off award of two to three fixed-price fully burdened IDIQ contracts, with task orders to be solicited and awarded from among the IDIQ holders following award of the base contracts. AR 375; AR 379-80.

The RFP further provided for awards on a best-value tradeoff basis, considering the following evaluation factors: (1) technical capabilities; (2) quality control program; (3) past performance and experience; (4) facility clearance; and (5) cost/price. AR 380-82. For purposes

---

[4] *See infra* notes 16-17 and accompanying text.

[5] The RFP was amended four times.

of the best value tradeoff, the technical capabilities factor was more important than the quality control program and past performance and experience factors; and the quality control program factor and past performance and experience factors were of equal importance.  The non-cost/price factors, when combined, were significantly more important than cost/price.  AR 380-82.

For the evaluation of cost/price, and relevant to this protest, the RFP contemplated that the agency would evaluate the realism and reasonableness of each offeror's proposed cost/price for the base and option years.  Specifically, the RFP stated:

> **M-007 - COST/PRICE EVALUATION**
>
> The Government will review and evaluate the Price proposals (Attachment C - Ceiling Rates and Attachment D - Sample Pricing) for both Price Realism and Reasonableness. The Government will review and evaluate separate cost elements and profit in the offeror's proposal (including cost or pricing data or information other than cost or pricing data), and apply judgment to determine Price Realism. Upon completion of the Price Realism Analysis, the Government will also perform a price analysis based on the proposed Sample Pricing (Attachment D). The Government will evaluate the deviations/exceptions and/or conditional assumptions for acceptability. The Government will also evaluate all Representations, Certifications, and Other Statements of Offerors.

AR 378.[6]  Specifically, offerors were to calculate the hourly ceiling rate for more than 30 specified labor categories and associated security clearance levels for each period of performance and enter the rates into Attachment C – Ceiling Rates, a completed table with proposed hourly ceiling rates.  AR 378; AR 244 (Attachment C, Revised Hourly Ceiling Rates).  To establish the fixed, fully burdened labor ceiling rates for each labor category and performance year in Attachment C, offerors were instructed to apply their indirect costs, general and administrative (G&A) costs, and profit to the direct labor rate.  AR 378. Offerors were instructed to provide a complete cost breakdown showing all cost elements or loads – such as unburdened labor rate, fringe benefits, overhead, G&A, and profit.  *Id.*

As indicated in the RFP, offerors were also required to submit sample pricing for a task order, Attachment D.  *Id.*; AR 245-49 (Attachment D).  Attachment D would automatically populate the hourly ceiling rates entered into Attachment C to calculate the sample price for a hypothetical five-year task order.  AR 245.

And finally, the RFP incorporated FAR 52.217-5, Evaluation of Options, under which the agency adds the total price for all options to the total price for the basic requirement, to calculate a total price for the contract when it is evaluating offers for award.  AR 378.

### B. GAO Protests and Corrective Action

---

[6] This section was amended by amendment No. 0002 to include: (Attachment C - Ceiling Rates and Attachment D - Sample Pricing) and (Attachment D).

The agency received timely proposals from 12 offerors. AR 1011. In September 2022, awards were made to Maven and HTGS. AR 1065. On October 27, 2022, APRA filed a post-award protest with the GAO challenging the agency's price and technical evaluation of the proposals and subsequent best-value determination. AR 1065. The protest was dismissed as academic based on the corrective action proposed by the agency. *Id*.

As a result of the corrective action, on December 1, 2022, the agency issued amendment No. 0002 which included a revised ceiling rates table and revised sample pricing spreadsheets. AR 177. APRA then filed a pre-award protest challenging the terms of this amendment. AR 1065. Again, the agency took corrective action on December 9, 2022, resulting in amendment No. 0004. AR 318. The protest was, therefore, dismissed as academic.

In line with amendment No. 004, the agency invited four small businesses, including APRA, to participate in the Corrective Action Best and Final Offer ("BAFO") proposal request. AR 1011. APRA and Maven submitted final technical proposal revisions (HTGS and DGI elected not to revise their technical proposals), and all four offerors submitted revised price proposals. *See* AR 12-13.

On December 15, 2022, the OPR Operations Support Services Technical Evaluation Team ("TET")[7] concluded its review of the revised proposals. AR 985. The TET reviewed and evaluated the technical portion of the bids. After its evaluation, the TET recommended HTGS, Maven, and DGI for the contract award. *Id*.

On December 29, 2022, the Department of State Cost Evaluation Team ("CET") completed its cost/price evaluations. AR 987. The review was performed per the Source Selection Plan. *Id*. The CO was on the panel. *Id*. After the evaluation, on January 9, 2023, it was determined that the proposals submitted by HTGS, DGI, and Maven represented the best-value to the government and IDIQ contracts were awarded to HTGS, DGI and Maven. AR 1004. This led to another protest by APRA. In its protest, APRA "challeng[ed] virtually every aspect of the agency's evaluation and award decisions." AR 1066.

On April 17, 2023, the GAO held an outcome prediction alternative dispute resolution conference ("ADR"). Here, the GAO attorney assigned to the protest advised that she would likely draft a decision sustaining APRA's challenges to the agency's price realism evaluation. The GAO attorney concluded that agency's price realism evaluation, which "consisted merely of a comparison of the offerors' proposed prices, was insufficient where the record was devoid of any documented considerations of each offeror's respective technical approaches." *Id*. As to all the other claims asserted by APRA, the GAO attorney indicated that she would deny them. *Id*.

Considering the representations by the GAO attorney, on April 18, 2023, the agency stated that it would take corrective by "reconsidering the price realism evaluation in accordance with the Solicitation and making a new Best Value Award Determination taking into consideration the updated price realism evaluation and prior technical and price reasonableness

---

[7] The TET reviewed and evaluated the technical portion of the bids.

evaluation findings." *Id*. Once again, due to the agency's representations, the GAO dismissed the protest as academic. *Id*.

Thereafter, the CO (who was also the SSA) conducted and documented a revised price realism evaluation of the final revised pricing proposals. AR 1028. To begin its evaluation of price risk, the agency first reviewed aspects of the offerors' technical evaluations as they compared to price.[8]

> Technical Evaluation Factor 1, Technical Capabilities, the Government will evaluate each offeror's proposed approach to addressing each Statement of Work (SOW) functional area.
>
> Technical Evaluation Factor 3, Past Performance and Experience, the Government will evaluate the extent to which the Offeror has demonstrated experience and qualification in performing work similar to the services detailed in the Statement of Work.
>
> The evaluation of the aforementioned factors is not only a strong indicator of whether the offeror has the experience/knowledge/capability of meeting the solicitation performance requirements and provides confidence to the Government in the Offeror's proposed technical approach. The evaluation of these factors can also be utilized in evaluating price risk[.]

AR 1030. In reviewing APRA's bid, APRA received marks of **Acceptable, Acceptable** and **Satisfactory Confidence** ratings for its Technical Evaluation Factors 1, 2 and 3, respectively, based on approaches proposed and similar experiences cited. The agency concluded that APRA's submission represented a high priced, reasonably low-risk solution in providing staffing support.

Maven received marks of the **Superior, Acceptable** and **Substantial Confidence** ratings given by the TET for Technical Evaluation Factors 1, 2 and 3. The TET found that the information provided did not give the agency any concern about Maven's proposed rates being too low to support the functional areas.

DGI received rating of TET awarded **Superior, Superior** and **Satisfactory Confidence** ratings to Technical Evaluation Factors 1, 2 and 3 respectively. With regard to its low price the agency found that that although their quoted sample task price is 15.5% lower than the competitive range group average and 12.5% lower than the IGCE, the DGI solution is a competitively priced, low risk solution with no concerns regarding the rates being too low to support functional areas.

---

[8] Although not specifically indicated under the agency's analysis, the agency also relied on Technical Evaluation Factor 2, Quality Control Plan. Factor 2 required the government to evaluate each offeror's proposed quality control statement showing how each offeror will meet all the requirements. AR 240.

The agency then evaluated offerors' proposed sample pricing and the separate cost elements of their proposed labor rates and compared offerors' total evaluated sample pricing to both the independent government cost estimate ("IGCE") and the prices proposed by competing offerors.  AR 1035.  The IGCE used was $35,713,620.20, AR 1035, and was based on the historical pricing of non-competitively awarded incumbent contracts.  AR 1036.  Table 1 below provides a visualization of the total evaluated sample pricing for each competitive range offeror across the base and option years.

Table 1

| CONTRACT PERIOD | APRA | DGI-ATI | HTGS-CULMEN | MAVEN-OFS | Offeror's Average Rate | IGCE Rates Estimated |
|---|---|---|---|---|---|---|
| Base Period | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX |
| Option Period 1 | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX |
| Option Period 2 | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX |
| Option Period 3 | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX |
| Option Period 4 | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX |
|  | $46,098,723.00 | $31,600,791.40 | $41,849,895.40 | $29,969,568.40 | $37,379,744.55 | $35,713,620.20 |

| Difference from Group Average Rate | Amount | $8,718,978.45 | $(5,778,953.15) | $4,470,150.85 | $(7,410,176.15) | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | % (Under)/Over | 23.33% | -15.46% | 11.96% | -19.82% | | |
| Difference from IGCE Estimated | Amount | $10,385,102.80 | $(4,112,828.80) | $6,136,275.20 | $(5,744,051.80) | | |
| | % (Under)/Over | 29.08% | -11.52% | 17.18% | -16.08% | | |

AR 1035.  The agency also evaluated the proposed unburdened labor rates of each offeror to determine if the salaries proposed would support the RFP's staffing requirements and were not too low.  The agency's analysis found that APRA and HTGS, the two highest-priced offerors, each proposed salaries in excess of $XXXXX for XX of 37 labor categories, and XX of 37 labor categories, respectively.  In addition, APRA's and HTGS's unburdened labor rates each included security clearance level premiums of XXXX percent and XXXX percent, respectively.  Table 2 below depicts a comparison of the offerors' unburdened labor rate to the average unburdened labor rate of the competitive range group.

Table 2

| Labor Category | APRA LLC | DGI-ATI | HTGS Culmen JV | Maven OFS JV | Offeror's Average Rate |
|---|---|---|---|---|---|
| Company Average Unburdened Labor Rate | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX |
| Difference from Group Average Rate | XXXXXXXX | XXXXXXXX | XXXXXXXX | XXXXXXXX | |
| | XXXXXX | XXXXXX | XXXXXX | XXXXXX | |

AR 1036.  The CO noted that the two lower-priced offerors, DGI and Maven, did not propose salaries in excess of $XXXXX for any labor category and neither proposed to pay security

6

clearance premiums. The CO also noted that based on market research, Maven's initial success in recruiting incumbent personnel on previously awarded task orders under these contested contracts, and historical pricing, allowing the CO to determine salaries in excess of $XXXXX or clearance premiums were not required to successfully fulfill the contract. *Id.*

After completing the revised realism evaluation, the agency concluded that all four offerors' proposals demonstrated an understanding of the solicitation requirements, that there was a low risk of unsuccessful performance, and that each proposed realistic labor rates. As a result, the CO again determined that HTGS's, DGI's, and Maven's proposals represented the best value to the government. AR 1044.

On May 26, 2023, the agency informed APRA that the three contract awards would stand. AR 1045-46. On June 5, 2023, ARPA filed its fourth protest at the GAO challenging the agency's contract awards to Maven and DGI. AR 1. Specifically, APRA argued that the agency could not have reasonably determined the proposals submitted by these two joint ventures offered the Agency the "best value" because the Agency's price realism evaluation of offerors' proposed pricing used a flawed approach and was not supported by the record. *Id.*

On September 7, 2023, the GAO denied APRA's protest. AR 1062. In its denial, the GAO found that the agency's comparison of various cost elements of DGI's and Maven's sample pricing to the IGCE and the other offerors' prices was unobjectionable.[9] AR 1069. The GAO noted that agencies have discretion in how they utilize a government estimate in a realism evaluation, and agencies are not required to find that proposed costs below the government estimate are unreasonable. AR 1070. The GAO also found that APRA did not meaningfully rebut the agency's conclusion that the IGCE likely skewed high, and that Maven's prices, which are the lowest, still allowed it to capture 90 percent of the incumbent staff when awarded the first two task orders. *Id.* Finally, the GAO found that the agency was not required by the RFP or the regulations to conduct a more in-depth analysis, as APRA argued. AR 1070-71. Thus, the GAO found that the agency's revised price realism evaluation was not unreasonable.

On September 22, 2023, this post-award protest was filed.

## II. JURISDICTION AND STANDARD OF REVIEW

The United States Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

### A. Bid Protest

---

[9] It does not appear that Plaintiff challenged the price comparison on the average pricing of all offerors as Plaintiff challenges here.

When resolving a motion that arises from a bid protest, the Court reviews the challenged agency action pursuant to the standards set forth in the Administrative Procedures Act. 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706(2)(A). The standard of review in a bid protest is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). To prevail, a plaintiff must demonstrate: 1) that the procurement decision "lacked a rational basis"; or 2) "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1332-33.

However, the Court should not "substitute its judgment for that of the agency[.]" *E.g., Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 785 (2011) (citation omitted). The "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis,'" and "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them.'" *Impresa*, 238 F.3d at 1332 (citations omitted). As long as the Court finds a "reasonable basis" for the agency's procurement decision, it "should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Vanguard*, 101 Fed. Cl. at 779 (citation omitted).

Thus, the Court's review is "highly deferential" to the agency's decision. *Id.* (citation omitted). "The court must show especially great deference to the agency's technical evaluations, past performance ratings, and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials.'" *Id.* at 780 (citation omitted). Additionally, even if the protestor can show errors in the procurement process, the protestor must then show that it was "significantly prejudiced" by those errors. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005). To establish significant prejudice, the protestor must show that "there was a 'substantial chance' it would have received the contract award but for the [agency] errors in the bid process." *Id.* at 1358 (citations omitted); *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013).

### B. Preliminary Injunction

In deciding whether to grant a temporary injunction or preliminary injunction, the Court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the plaintiff's irreparable harm without injunctive relief; (3) the balance of hardships to the respective parties; and (4) the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). Failure to meet the criteria of any one factor may require denial of the request for preliminary relief. *Id.* However, the Federal Circuit has clarified that a plaintiff cannot be granted a preliminary injunction "unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

### C. Best Value

When a contract that is the subject of a bid protest was awarded based upon best value,

the agency has even greater discretion than if the contract were awarded upon the basis of cost alone.  *Galen Med. Assoc. Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).   The relative merit of competing proposals is primarily a matter of administrative discretion.  *Galen Med. Assoc.*, 369 F.3d at 1330 (quotation omitted); *see also Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 264 (2011) (recognizing the discretion that is afforded to contracting officers in a best value procurement).

A best-value determination should not be disturbed so long as the agency documents its final award decision and includes the rationale for any business judgments and tradeoffs made.  *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl.488, 514 (2009).   An agency's contract award is least vulnerable to challenge when based upon a best value determination.  *Planetspace, Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010).

### III.    DISCUSSION

Although there are four factors to weigh in deciding where to grant or deny a preliminary injunction, *see supra* p. 8, failure to meet the criteria of any one factor may require denial of the request for preliminary relief.  *See PGBA, LLC*, 389 F.3d at 1228-29.  Even so, a plaintiff cannot be granted a preliminary injunction unless it establishes both first two factors: likelihood of success on the merits and irreparable harm.[10]  *Amazon.com, Inc.*, 239 F.3d at 1350.  APRA has failed to do so.

#### A.  APRA cannot show a likelihood on the merits.

 Keeping in mind that the contract here was awarded based upon best value, the Court notes that the agency has even greater discretion than if the contract were awarded upon the basis of cost alone.  *Galen Med. Assoc.,* 369 F.3d at 1330.  Indeed, agencies have "substantial discretion to determine which proposal represents the best value for the Government" and the courts are not to "second guess" a best value rating as long as the agency documents its final award decision and includes the rationale for any business judgments and tradeoffs made.  *Blackwater Lodge*, 86 Fed. Cl. at 514.

The Court, therefore, is required to review the agency's reasoning only to "ensure that the CO examined the relevant data and articulated a rational connection between the facts found and the choice made."  *Tetra Tech AMT v. Dell Servs. Fed. Gov't, Inc.*, 128 Fed. Cl. 169, 185 (2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  With that backdrop, the Government argues that APRA has failed to demonstrate any error or prejudice in the agency's best-value determination.  ECF No. 35 at 24.

Plaintiff argues that in conducting its price realism analysis, the agency's analysis was flawed in three respects: (1) the IGCE "was not an appropriate benchmark for comparison"; (2) the agency inappropriately compared all offerors' pricing with an average of those prices; and (3) the agency unreasonably concluded that DGI and Maven proposed realistic prices.  ECF No. 34.

---

[10] Because APRA cannot satisfy either, the Court need not address the other elements.

at 10-19.  Simply put, the CO should have used her judgment to find that Maven's and DGI's pricing was unrealistic because their pricing was too low.

The Court evaluates each of APRA's arguments below.

### 1. Did the agency satisfy the RFP's price realism analysis when it compared *average* unburdened prices as well as comparing the unburdened prices to the IGCE?

The RFP stated that the agency would "review and evaluate the Price proposals for both Price Realism and Reasonableness."  AR 241.  The RFP further stated that the agency would "review and evaluate separate cost elements and profit in an offeror's proposal (including cost or pricing data or information other than cost or pricing data) and apply judgment to determine the price realism of an offers' proposed cost/price."  AR 241, 382.  "Upon completion of the Price Realism Analysis, the Government will also perform a *price* analysis based on the proposed Sample Pricing (Attachment D)."  *Id.*  (emphasis added).

It is APRA's contention[11] that the RFP demanded that the agency complete a "*cost* realism analysis" because the RFP required cost-reimbursement work.  ECF No. 34 at 9 (emphasis added) (citing 48 C.F.R. §§ 15.404-1(d)(1) and (2)).[12]  APRA argues that the IGCE was not an appropriate benchmark[13] because (1) a comparison of total offeror sample task

---

[11] Both parties agree that "[t]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation."  *Id.*  at 358.  In addition, both agree that the Court must assess whether an agency's price realism evaluation was consistent with the solicitation's evaluation criteria.  *See Galen Med. Assocs*, 369 F.3d at 1330.  And finally, both parties agree that the CO's price realism analysis need not be perfect, just rational.  *See* Transcript of Hearing/Oral Argument at p. 73, ¶¶ 8-9 (October 26, 2023) [hereinafter "Tr."].

[12] The FAR defines cost realism analysis as:

> Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

48 C.F.R. §§ 15.404-1(d)(1) and (2).  APRA argues that FAR § 15.404 is relevant as it provides an agency with the authority to use cost realism analysis techniques to assess the "realism" of pricing proposed for fixed-price contracts.  *See* 48 C.F.R. §15.404-1(d)(3). The Court notes, however, that the RFP is silent as to this particular FAR provision.

[13] At oral argument, counsel admitted that IGCE can be used as a benchmark by contracting officers.  Tr. at p. 36, ¶¶ 3-5.

pricing to historical total pricing is inconsistent with the RFP's price realism methodology; (2) the IGCE does not, in fact, include incumbent burdened rates; and (3) the IGCE and the RFP included different labor categories.  ECF No. 34 at 10-12.

Conversely, the Government argues that the RFP only required a *price* realism analysis. The Government argues that an appropriate price realism analysis can include "comparison of the prices received with each other; comparison of previously proposed prices for the same or similar items; comparison with the independent government estimate; and analysis of pricing information provided by the offeror."  ECF No. 35 at 12 (citing *Afghan Am. Army Servs. Corp. v. United States,* 90 Fed. Cl. 341, 358 (2009)).  Thus, the Government contends that the revised price realism evaluation was done "in line with the RFP and applicable legal standards, [and thus] the agency's conclusions that DGI and Maven provided realistic pricing are reasonable and supported by the record."  ECF No. 35 at 12.[14]

To begin, APRA contends that even though the RFP advised offerors that the agency would review the separate cost elements of an offerors' proposed labor rates as part of its price realism evaluation of each offeror's proposed pricing, the agency did not do so.  *Id*. at 10-11. The Court notes, however, that as required by the RFP, the CO reviewed the separate cost elements of the offerors' proposed labor rates in charts found in the administrative record.  *See* AR 999-1000; 1002-03.  The charts indicate each and every position to be filled, together with the allowance for secret and top-secret clearance.  Below is a sample:

| Labor Category | Clearance Level* | | DGI-ATI | HTGS Culmen JV | Maven OFS JV | Offeror's Average Rate |
|---|---|---|---|---|---|---|
| Administrative Specialist I | Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| | Top-Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| Administrative Specialist II | Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| | Top-Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| Administrative Specialist III | Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| | Top-Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| Administrative Manager | Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |
| | Top-Secret | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx |

 AR 999.  Then, after the revised bids were received the CO again compared each labor category as well as finding an average rate.  Clearly, the CO reviewed each of the separate cost elements of the offerors' proposed labor rates contrary to APRA's argument that she did not.

The CO could have stopped at this juncture.  However, she then compared pricing using the IGCE.  Because the IGCE only included "burdened" labor rates and did not include a breakdown of separate cost elements as required by the RFP, this comparison, according to APRA, was an inappropriate benchmark.  ECF No. 34 at 11 (citing AR 1023).  Specifically,

---

[14] In addition to its disagreement, the Government argues that as these are best-value contract awards, APRA has "provided no basis for the Court to second-guess the SSA's best-value determination."  ECF No. 35 at 24 (citing *Spectrum Comm, Inc. v. United States*, 126 Fed. Cl. 778, 794 (2016)).

because burdened labor rates were included, APRA contends the IGCE did not allow for an "apples to apples" comparison of the direct labor rates. *Id*. (citing *Afghan Am. Army Servs*, 90 Fed. Cl. at 359).[15]  Moreover, APRA further argues (1) that the IGCE did not include information relevant to the technical approach both Maven and DGI stated each would adopt during task order performance, which included recruiting and retaining incumbent personnel; (2) that the agency did not explain the difference in pricing between the hourly incumbent rates compared to the rates identified for the Base Year of the IGCE; and (3) that the IGCE did contain different labor categories, and that these differences should have been acknowledged or accounted but they were not. *Id*. at 11-13.

At the hearing/oral argument, the CO testified that the IGCE is commonly used for budgetary reasons. Tr. at p. 48, ¶¶ 9-19. She testified that it is a baseline estimate, and that in some instances the IGCE amount may be higher and at other times lower than the submitted bids. *Id*.; AR 1036. The non-competitive IGCE was used as a comparison because the current contracts are for 8(a) set-asides, and commonly 8(a) set-asides are non-competitive. AR 1036. In her report, the CO noted the difference and concluded that the IGCE was high. Therefore, she noted that even though Maven's proposed sample pricing was under the IGCE "did not raise a red flag." *Id*.

The Court agrees that the IGCE is an appropriate benchmark.[16] There is nothing in the RFP that precludes this comparison. Furthermore, it has been held that using the IGCE in a price

---

[15] In *Afghan American*, the court found that the agency erred in failing to conduct a sufficient price realism analysis because the analysis it did undertake was based upon "irrational assumptions or critical miscalculations." *Afghan Am.*, 90 Fed. Cl. 341, 359. Contrary to Plaintiff's contentions, *Afghan American* is distinguishable here as the independent government estimate ("IGE") in *Afghan American* did not include all categories of work contained in the solicitation, and the agency was aware of this. *Id*. The court thus found that conducting a price realism analysis using a "significantly and materially understated" IGE was contrary to the method set out in the RFP and was unsupported because it was based on "irrational assumptions or critical miscalculations." *Id*. Here, there are no irrational assumptions or critical miscalculations in the IGCE that render it incomplete or flawed, as in *Afghan American*. Additionally, *Afghan American* is distinguishable because in that case the agency failed to evaluate whether the offerors could perform at their proposed prices. *Afghan Am.*, 90 Fed. Cl. at 359.

[16] At the hearing, counsel for APRA further articulated that instead of using the IGCE, the agency should have compared unburdened labor rates with market rates and incumbent rates. Tr. at p. 31, ¶¶ 2-8. If the agency had done so, APRA asserts that the CO's judgment that Maven's and DGI's pricing were reasonable would not be rational. According to counsel, APRA referred to market data in its proposal proving its pricing was the going market rate. Regarding Maven and DGI, APRA argues these entities did not provide any market data but if they had, the research would have shown that their unburdened labor rates, which required secret and top-secret clearance, were unreasonable.

realism analysis is an appropriate benchmark (and APRA agrees but not as applied here).  Tr. at p. 36, ¶¶ 3-5; s*ee also Afghan Am.*, 90 Fed. Cl. at 358 (The court held that the when the "agency compared the prices received with each other and with an IGE based on acquisition of previous similar items, and [then] reviewed the proposals for compliance with the terms of the solicitation[] [t]hat would, in these circumstances, ordinarily satisfy its requirement to perform a realism analysis.").  Although the IGCE did not encompass all aspects of the RFP, again, it was used only as a benchmark for budgeting purposes and "to get an idea of what [the contract] will cost."  Tr. at p. 48, ¶¶ 9-19.  Therefore, the CO's evaluation using the IGCE was not arbitrary and capricious and was rational.

### 2. Does comparing sample task pricing of each offeror to the average of the total sample task pricing satisfy the RFP?

APRA acknowledges that the agency considered and compared the direct labor costs proposed by each offeror.  ECF No. 34 at 13.  The administrative record shows that the agency, as part of its price realism evaluation, compared one year of each offerors' unburdened labor costs.  AR 1036.  Nevertheless, APRA argues that the agency should have "determine[d] whether the direct labor rates proposed by the offerors were adequate to recruit and retain incumbent personnel or individuals from the current labor market" by "compar[ing] the total direct labor costs proposed by the offerors to the total direct labor rates paid incumbent staff or to market data."  ECF No. 34 at 13.

The Court disagrees. Case law provides that an appropriate price realism analysis can include "comparison of the prices received with each other."  *Afghan Am.*, 90 Fed. Cl. at 358 ("[T]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion.").  Therefore, when the agency compared the offeror's total prices to each other as part of its price realism analysis, unless the RFP prohibited it, which it did not, it was within the sound discretion of the agency to conduct the additional analysis.

### 3. Was the agency's pricing determination proposed by Maven and DGI reasonable?

Maven's and DGI's unburdened labor costs were approximately 17% and 13% less, respectively, than the average unburdened labor costs of all the offerors for the same period.  AR 1036.  This is unrealistic according to APRA.  In support, APRA argues that although it included a "premium" for personnel with security clearances, AR 35, neither Maven nor DGI "[took] into account the fact that the incumbents were 'cleared' personnel and the contract had to be staffed

---

Although Maven's proposal states that it used market data in calculating its pricing, it does not appear that Maven provided any market data in its proposal.  *See* AR 887 ("M-OFS uses CompAnalyst, Payscale, and other reliable salary market data to validate our pricing.").  The agency, however, did perform lengthy analyses regarding the proposals.  And after reviewing their proposals and using her judgment found the unburdened labor pricing reasonable.  *See supra* Table 2.  Her decision to award the contracts to the lowest priced bids was, therefore, rational.

with 'cleared' personnel." ECF No. 34 at 15.  Thus, according to counsel, the agency should not have considered their proposed direct labor rates realistic.  Moreover, APRA contends, Maven's representations that it was able to hire 90% of the incumbents at the unburdened labor rates was untrue.[17]  *Id*.  During the hearing/oral argument held on October 26, 2023, the Court heard from the CO to determine her veracity.[18]

---

[17] In support of APRA's contention that the agency knew Maven's representations were untrue, APRA points to work being done by Maven through a subcontract with Cherokee Nation System Solutions under a different IDIQ contract through Task Orders. ECF No. 35 at 6.  With these Task Orders, Maven employed and attempted to employ several of the incumbent's employees.  AR 2088.  However, in an email dated October 21, 2022, Maven indicated that it "would like to transition as many as the incumbents as possible to maximize the continuity of service to the government on the task orders" *id*., but it was unable to because Maven had "priced the labor categories based on the required years of in the position description and some of the incumbents far exceed the requirements."  *Id*.  This, according to APRA, shows that (1) Maven was not able to retain 90% of the incumbents; and (2) the CO should have known that Maven could not perform the contract at the prices it proposed.

[18] As an initial matter, in APRA's motion to supplement the record, APRA lists eleven APRA employees, together with their declarations, asserting that between September 30, 2022, and October 27, 2022, either (1) did not receive offers of employment from Maven; or (2) did receive an offer from the Maven but did not accept the offer.  ECF No. 39.  According to APRA, these declarations counter the declaration of Ms. JoAnn Carroll, the CO for the procurement at issue in this protest, which provided context about the October 21, 2022, email.  Ms. Carroll states:

> The two orders included a total of 39 positions, there were five vacant positions to be filled with new hires, resulting in 34 incumbent staff positions to be transitioned, and Maven immediately began the transition process. . . . Maven was able to secure 31 incumbent staff for employment on its task orders. [31 is 91% of 34.]

ECF No. 39 (citing Carroll Decl. ¶¶ 6-7).  APRA contends the agency never represented to the GAO that it confirmed this number and more importantly that the agency only accepted Maven's representations as to its success with incumbent hires.  *See generally* Tr.

The "challenged procurement decision" here is the agency's new IDIQ awards made on revised price proposals received in December 2022, not Maven's pricing or ability to hire under the first task orders, which are obsolete.  Therefore, any question about Maven's prior prices, including whether they were high enough to do the work or capture incumbents, are immaterial when those prices have been superseded by Maven's revised price proposals (which were higher than their previous ones) and the agency's new award decisions.  In the revised pricing, the CO further noted an approximate 3% increase in Maven's proposed labor rates.  *See* AR 1002-1003.  Thus, the Court holds that allowing the declarations into evidence does not change the outcome.

The question remains whether the agency rationally concluded that Maven's (and DGI's) revised prices reflect a lack of understanding of the requirements or present any risk to their performance of the technical work.  Again, the agency's revised cost estimate explained in detail the cost analysis.  By stating that APRA's pricing included a premium for security clearance whereas DGI and Maven did not, this statement did not alter the CO's decision that all four offerors' pricing was reasonable.  Indeed, the question as to whether her judgment was rational, that is whether her decision to find the DGI's and Maven's proposals to low to attract the incumbents is supported by the record. The Court further finds the CO's testimony as well as her revised cost estimate truthful.  The CO relied on the proposals for their truthfulness and if the contract cannot be performed at the price proposed, that risk is on the offeror.  Tr. at p. 25, ¶¶ 23-24; p. 80, ¶ 22; p. 83, ¶ 19.

Also, the Court does not lose sight of the fact that technical evaluation was more important than price.  Here, APRA had the lowest technical score.  And although it is true as APRA explained, price is important when considering technical abilities, i.e., whether the incumbents can be retained, Tr. at pp. 301-31, ¶¶ 16-4,  the record demonstrates that the agency rationally evaluated whether Maven and DGI could perform the requirements of the RFP at the prices they proposed, including recruiting incumbent staff as required in the RFP, *see* AR 1090, and the agency reasonably concluded, based on the technical approaches and offered prices, that they could.  AR 1031-32, 1034-35.

In conclusion, as discussed above, the record shows that the agency evaluated the offerors' proposals under the evaluation criteria found in the RFP.  The agency then reasonably concluded that the highest technically rated and lowest priced offerors presented the best value to the Government.  AR 1041-44.  Therefore, APRA's contention that the price realism evaluation was flawed is unsupported by the record before this Court, and the Court will not second guess the agency's best-value determination.  The Court thus holds that the agency's decision was rational.

### B. APRA cannot show irreparable harm.

APRA contends that it will be irreparably harmed in two ways: (1) it will lose its current employees during the transition, and (2) it will lose – and the awardees will gain – valuable experience performing the required services during the transition. ECF No. 34 at 21.  Neither of these alleged harms, however, are recognized as irreparable harm.  In particular, the loss of personnel by an incumbent contractor during a transition period generally does not constitute irreparable injury.  *IBM Corp. v. United States*, 118 Fed. Cl. 677, 684-85 (2014) ("[T]he mere fact that an incumbent's employees begin to move over to work for the awardee does not without more, constitute irreparable harm").  Furthermore, APRA's contention that if the awardees are allowed to perform, they will gain experience and APRA will be at a competitive disadvantage in future procurements, ECF No. 34 at 21-22, is not irreparable harm.  In *Akima Intra-Data, LLC v. United States*, 120 Fed. Cl. 25, 28 (2015), the court held that "all sorts of things that any incumbent would experience upon the loss of a successor contract are not sufficient to demonstrate irreparable harm." *Akima* at 28 (quoting *CRAssociates, Inc. v. United States*, 103 Fed. Cl. 23, 26 (2012)).  APRA has not demonstrated that irreparable injury is likely in the absence of an injunction, and therefore, its request for an injunction must fail.

## IV.     CONCLUSION

For the reasons set forth above, the Court **DENIES** APRA's Motion for Preliminary Injunction.  Considering this opinion, the request for bond is denied.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge
